| | |
|---|---|
| DCT to contribute general knowledge and research for fuel cells, manufacturing processes, commercialization strategy, and plan for entry into market.[11] | DCT to contribute all fuel cell work to date, including patents, know-how, key employees (e.g., Mike Crawford), equipment, inventory, etc.[12] |
| Each side to bear its own costs during initial product development.[13] | Each party to bear its own transaction costs.[14] |
| Michael Crawford, of DCT, to be Vice–President.[15] | Michael Crawford to be Executive Vice–President.[16] |

1. Henderson dep tr, pp 208–9; Third Amended Complaint, ¶¶ 24, 30; Stone Affidavit, ¶ 8A
2. Letter of Intent, pp 2–3
3. Henderson dep tr, pp 208–9; Third Amended Complaint, ¶¶ 24, 30; Stone Affidavit, ¶ 8
4. Letter of Intent, p 1, "This Letter of Intent....contains the proposal by Edison...to enter into a Project Development Agreement with DCT, Inc....to develop, manufacture and distribute small scale...fuel cell systems capable of delivering electricity and heat to homes."
5. Henderson dep tr. pp 208–9; Third Amended Complaint, ¶¶ 24, 30; Stone Affidavit, p 8A
6. Letter of Intent, p 1
7. Henderson dep tr, pp 208–9; Third Amended Complaint, ¶¶ 24, 30
8. Letter of Intent, p 1
9. Third Amended Complaint, ¶¶ 24, 30; Stone Affidavit, ¶ 8C
10. Letter of Intent, p 2
11. Third Amended Complaint, ¶¶ 24, 30, 31; Stone Affidavit, ¶ 8D
12. Letter of Intent, p 1
13. Stone Affidavit, ¶ 8D
14. Letter of Intent, p 5
15. Michael Crawford dep tr, pp 408, 425
16. Letter of Intent, p 4

**Kristin A. OLIVER, Plaintiff,**

v.

**CITY OF BERKLEY, a municipal corporation, Bruce Henderlight, and Brent Smith, jointly and severally, Defendants.**

No. 01–CV–71689.

United States District Court,
E.D. Michigan,
Southern Division.

April 22, 2003.

Carol A. McNeilage, Kepes, Wine, Joseph P. McCarroll, Stephanie A. Berg, Southfield, MI, for Plaintiff.

James I. Degrazia, Timothy Mulligan, O'Connor, DeGrazia, Bloomfield Hills, MI, John J. Hoffman, Thomas, Degrood, Southfield, MI, for Defendants.

*OPINION AND ORDER GRANTING IN PART DEFENDANTS CITY OF BERKLEY'S AND HENDER-LIGHT'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT SMITH'S JOINDER IN THE MOTION FOR SUMMARY JUDGMENT, AND DISMISSING PLAINTIFF'S CLAIMS AS TO DEFENDANTS CITY OF BERKLEY AND HENDERLIGHT ONLY*

STEEH, District Judge.

Defendants City of Berkley and Bruce Henderlight move for summary judgment

of plaintiff Kristin Oliver's 42 U.S.C. § 1983, Elliott–Larsen Civil Rights Act ("ELCRA"), and intentional infliction of emotional distress claims that are premised on May 3, 1998 sexual assaults allegedly committed by former Berkley Police Officer defendant Brent Smith. Defendant Smith filed a "joinder" in City of Berkley's and Henderlight's motion for summary judgment to the extent defendants argue the claims are barred by release. A hearing on the motion was held on March 6, 2003. For the reasons set forth below, City of Berkley's and Henderlight's motion for summary judgment, and Smith's joinder in the motion, will be DENIED, IN PART, to the extent the motion is based on release. The remainder of City of Berkley's and Henderlight's motion for summary judgment will be GRANTED, with plaintiff's claims as alleged against City of Berkley and Henderlight ONLY being dismissed in their entirety.

### I. Background

Plaintiff Kristin Oliver alleges in her August 13, 2003 First Amended Complaint that she was arrested by Berkley Police Officer Brent Smith on May 3, 1998 for operating a motor vehicle while impaired by alcohol ("OWI"), notwithstanding a preliminary breathalyzer test performed by Officer Smith indicating a .07 blood-alcohol content, as compared to the minimum .08 blood-alcohol content needed to prove *per se* OWI. Plaintiff alleges she was sexually assaulted by Officer Smith during her arrest:

9. That Officer SMITH inappropriately touched plaintiff when she was carrying out his directions to walk a straight line.

10. That Officer SMITH again inappropriately touched plaintiff after ordering her into the back of his scout car on the pretext of conducting a search of her person for safety reasons.

11. That Officer SMITH next drove plaintiff to the BERKLEY PUBLIC SAFETY DEPARTMENT where he again inappropriately touched plaintiff by slowly sliding his hands up plaintiff's thighs until he reached her pubic area and then "cupping" her pubic area in his hand while telling plaintiff she was a very pretty girl and if she just cooperated everything would go all right for her.

12. That Officer SMITH next told Plaintiff he had to search her again for safety reasons. This time he put his hand inside her bra and felt her breasts. He reached into her underpants where he was prohibited from fully exploring her by her undergarment. He told her she had to remove her undergarment and give it to him whereupon he was able to put his hand inside her pants and feel her vulva again encouraging her to cooperate and things would go well for her.

13. That Officer SMITH intentionally and willfully caused a harmful and offensive contact with plaintiff by improperly touching her breasts and pubic area against her will constituting a battery and depriving plaintiff of her right to privacy.

14. That Officer SMITH repeatedly told plaintiff during these attacks that if she just cooperated things would go well for her conveying to plaintiff the impression that if she did not submit to this offensive touching things would not "go well for her" during her confinement.

15. That Officer SMITH intentionally watched plaintiff urinate when she used the lavatory facilities at the jail. He stood outside the door of the lavatory and watched plaintiff through the glass window located in the door.

16. That at no time did plaintiff harass, threaten, resist arrest or fail to "cooperate" with the defendant police officer or engage in any conduct which justified the actions of Officer SMITH. Plaintiff

complied with SMITH'S directives under duress and only due to his authority as a Berkley Police Officer.

August 13, 2001 First Amended Complaint, ¶¶ 9–16, at 3–4. In Counts I and II, respectively, plaintiff alleges Smith is liable for assault, and intentional infliction of emotional distress. Count III alleges Smith, City of Berkley, and Police Chief Bruce Henderlight are liable under 42 U.S.C. § 1983 for violations of plaintiff's civil rights as protected by the Fourth, Fifth, Eighth, and Fourteenth Amendments of the Constitution. Count IV alleges liability under Michigan's ELCRA, M.C.L. § 37.2101 *et seq.*, for sexual harassment.

Defendants City of Berkley and Henderlight previously moved for summary judgment on August 15, 2001[1] based on two written releases executed by plaintiff as part of her plea to a non-alcohol related charge of careless driving. The court performed a three-part *Rumery* analysis, consistent with *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), *Burke v. Johnson,* 167 F.3d 276 (6th Cir.1999), and *Coughlen v. Coots,* 5 F.3d 970 (6th Cir.1993), examining whether plaintiff voluntarily executed the releases, whether there was evidence of prosecutorial misconduct, and whether enforcement of the release agreements would affect relevant public interests. In denying the prior motion for summary judgment, this court reasoned:

> Construing the pleadings and evidence in a light most favorable to plaintiff, and even assuming that plaintiff voluntarily signed the subject release and that there is an absence of evidence of prosecutorial misconduct, it remains possible for plaintiff to develop a record demonstrating that, in this particular case, the public's interest in vindicating constitutional rights and deterring police misconduct weighs in favor of permitting plaintiff's case to go forward despite the signed release. Defendants' argument that the court must focus only on those facts and allegations of police misconduct that the prosecutor knew about at the time the release was executed (which here appears to be nothing) in [sic] not well taken, and at best, is properly directed at the second prosecutorial misconduct factor. The *Coughlen* court makes clear that, under the third public interest factor, substantial evidence of police misconduct supporting a § 1983 claim may of itself outweigh the public interest in litigation finality and docket control, even absent prosecutorial misconduct. *Coughlen,* 5 F.3d at 974. Stated differently, whether competing public interests weigh in favor of disregarding a release depends upon whether there is substantial evidence available that could support an actionable § 1983 claim of police misconduct even though, at the time the release was executed, the prosecutor properly sought the release. If plaintiff Oliver is able to produce substantial evidence that she was repeatedly sexually assaulted by defendant Officer Smith, this court could conclude that the public's interest in vindicating constitutional rights and deterring police misconduct, despite the release and absent evidence of prosecutorial misconduct, outweighs the more general prosecutorial interest in case load management, permitting plaintiff to proceed with her claims. *Id.* Release agreements are subject to closer scrutiny where, as here, there are allegations of police misconduct. *Burke,* 167 F.3d at 281.

---

[1]. The court granted Berkley Public Safety Department's motion for summary judgment as an improperly named party-defendant.

October 30, 2001 Opinion and Order, at 6–7. The court recognized that the burden of proving that the releases are enforceable is on the defendants. *Id.*, at 7 (citing *Burke*, 167 F.3d at 281).

## II. Motion for Summary Judgment

In their instant motion for summary judgment, defendants renew their argument for dismissal based on release, "refiling" their earlier 13 page motion for summary judgment as an exhibit. Defendant Henderlight also argues he cannot be held individually liable in the absence of proof that he encouraged or participated in Officer Smith's alleged sexual assault. Defendant Henderlight further argues he cannot be held individually liable because he is entitled to qualified immunity. Defendants City of Berkley, and Chief Henderlight in his official capacity, maintain they cannot be held liable under 42 U.S.C. § 1983 because plaintiff has failed to show that the alleged sexual assault was the result of an official policy, custom, or practice of deliberate indifference to plaintiff's constitutional rights. Defendants also argue that they are entitled to summary judgment of plaintiff's intentional infliction of emotional distress claim because Michigan does not recognize such a tort claim.

As to the defense of release, plaintiff counters that the defendants have not met their burden of proving that plaintiff voluntarily signed the releases, given her testimony that she agreed to plea to a lesser charge of careless driving, and thus to execute the releases, only because she reasonably believed her estranged husband's threats that she would lose custody of her daughter in a pending divorce action if she were found guilty of OWI. Plaintiff also argues that defendants have not shown that enforcing the "blanket releases" in light of uncontroverted evidence of police misconduct outweighs the strong public interest of discovering and rectifying meritorious constitutional claims of unlawful invasion of bodily integrity. Plaintiff continues that Chief Henderlight may be held individually liable as the Berkley Police Department's policy maker, and for his failure to properly train and supervise Berkley Police Officers. Plaintiff argues Chief Henderlight is not entitled to qualified immunity under an objective reasonableness standard as applied to Chief Henderlight's policies. Plaintiff argues that City of Berkley's and Chief Henderlight's policy of authorizing Berkley Police Officers to exercise their own discretion in conducting "complete searches" under the Berkley Public Safety Department's "General Public Order No. 15", coupled with a complete lack of training, constitutes a policy of deliberate indifference to the high risk that a female arrestee would be sexually assaulted by a Police Officer. Plaintiff also proffers evidence that Chief Henderlight's lack of supervision created a sexually hostile environment within the Berkley Police Department. Plaintiff asserts that a claim of intentional infliction of emotional distress is actionable in Michigan.

## III. Analysis

The standard for determining whether summary judgment is appropriate is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Winningham v. North Am. Resources Corp.*, 42 F.3d 981, 984 (6th Cir. 1994) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir.1989)). The evidence and all inferences therefrom must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Enertech Elec., Inc. v. Mahoning County Comm'r*, 85 F.3d 257, 259 (6th Cir.1996);

*Wilson v. Stroh Co., Inc.*, 952 F.2d 942, 945 (6th Cir.1992). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see also Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir.1995). Mere allegations or denials in the non-movant's pleadings will not meet this burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party cannot rest on its pleadings to avoid summary judgment, but must support its claim with some probative evidence. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.), *cert. denied*, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

### A. *Release*

#### i. *Voluntariness*

 In deciding whether a release was voluntarily executed, a district court should consider: (1) the sophistication of the criminal defendant; (2) whether that defendant was in custody when she made the agreement; (3) whether the defendant was represented by counsel; (4) whether the defendant had ample time to consider the agreement; (5) the nature of the criminal charges; and (6) whether the agreement was formed under judicial supervision. *See Hill v. City of Cleveland*, 12 F.3d 575, 577–578 (6th Cir.1993) (citing *Rumery*, 480 U.S. at 394, 107 S.Ct. 1187 (plurality opinion), 401–402 (O'Connor, J., concurring in part and in the judgment)). The fact that the criminal defendant was represented by an attorney is entitled to substantial weight in determining the voluntariness of a release waiving federal rights. *Staggs v. Ausdenmoore*, 992 F.2d

1217, 1993 WL 131942, at *3 (6th Cir.1993) (applying reasoning in *Berry v. Peterson*, 887 F.2d 635, 640 (5th Cir.1989) to *Rumery* analysis). A represented criminal defendant's subjective reservations for signing a release, if not made in open court nor objected to by her counsel, does not support a finding of involuntariness. *Id.*, at *4, 992 F.2d 1217.

 Plaintiff twice signed a 45–A District Court form entitled "Motion To Amend And/Or Dismiss Complaint", which read in part:

> RELEASE: DEFENDANT AGREES, AS A CONDITION OF THIS PLEA AGREEMENT, TO RELEASE THE CITY, ITS OFFICERS, EMPLOYEES, AND AGENTS FROM ANY CLAIMS, DAMAGES OR CAUSES OF ACTION OF ANY KIND BECAUSE OF ALLEGED INJURIES OR OTHER DAMAGE SUFFERED BY THE DEFENDANT THAT MAY ARISE FROM THE INCIDENT WHICH GAVE RISE TO THIS CASE OR FROM PROSECUTION OF THIS CASE.

Defendants' August 15, 2001 Exhibit B. It is undisputed that plaintiff signed the form on June 9, 1998, and again on July 9, 1998, that she was not in custody at the times she signed the forms, and that she was represented by Counsel. These written motions to approve plaintiff's bargained plea to careless driving were each granted by Michigan District Judge William Sauer. *Id.* There is no indication in the record that plaintiff or her Counsel raised plaintiff's subjective reservations about entering the plea agreement and executing the releases. Weighing the relevant factors—that plaintiff was not in custody when she twice executed the form, that she was represented by counsel, that she had a month to consider the release language before executing the second plea agreement, that

the agreements were subjected to judicial supervision, and that neither plaintiff nor her counsel objected in open court to the release language—this court concludes it is beyond reasonable dispute that plaintiff voluntarily executed the releases. *Hill,* 12 F.3d at 577–78; *Staggs,* 992 F.2d 1217, 1993 WL 131942 at *3–4 [2].

### ii. Prosecutorial Misconduct/Relevant Public Interests

■ The parties agree that the prosecutor had no knowledge of Officer Smith's alleged May 3, 1998 sexual assault at the time the plea agreements were executed on June 9, 1998 and July 9, 1998. Defendants emphasize this fact as an absence of prosecutorial misconduct, and argue that the relevant public interest factor must be analyzed from the perspective of what the prosecutor knew when plaintiff executed the releases. Defendants rely on *Livingstone v. North Belle Vernon Borough,* 91 F.3d 515 (3rd Cir.1996) and *Cain v. Darby Borough,* 7 F.3d 377 (3rd Cir.1993) (en banc) for the proposition that they have met the requisite two part test of proving an absence of prosecutorial misconduct *and* that relevant public interests weigh in favor of enforcing the release: (1) the objective facts known to the prosecutor support the prosecutor's proffered public interest reasons for accepting a plea agreement and executing the releases; and (2) the prosecutor's subjective decision to accept the plea agreement was not improperly motivated by an attempt to protect public officials from otherwise meritorious civil rights claims. Defendants maintain that the release is enforceable notwithstanding any possible merit to plaintiff's civil rights claims because the underlying criminal charge of OWI was not unfounded or artificially trumped-up.

The Third Circuit decisions relied upon by the defendants hold, in effect, that *Rumery* requires only a two part analysis:

In *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), a four-Justice plurality found that, as a matter of federal common law, a release-dismissal agreement will operate to bar a section 1983 claim unless "the interest in [the agreement's] enforcement is outweighed in the circumstances by a public policy harmed by the enforcement of the agreement." *Id.* at 392, 107 S.Ct. at 1191. Justice O'Connor, whose fifth vote was dispositive, noted in a concurring opinion that it is the burden of the defendants to demonstrate that "a particular release executed in exchange for the dismissal of criminal charges was voluntarily made, not the product of prosecutorial overreaching, and in the public interest." *Rumery,* 480 U.S. at 401, 107 S.Ct. at 1196.

In *Cain v. Darby Borough,* 7 F.3d 377 (3d Cir.1993) (in banc), *cert. denied,* 510 U.S. 1195, 114 S.Ct. 1303, 127 L.Ed.2d 655 (1994), this court addressed the circumstances in which enforcement of a release-dismissal agreement will be in the public interest. *Cain* made clear that the above-quoted passage from Justice O'Connor's *Rumery* concurrence *should not be read to suggest that the "prosecutorial overreaching" and "public interest" questions are to be analyzed separately;* rather, "the concept of prosecutorial misconduct is embedded in a larger inquiry into whether enforcing

---

**2.** The court also notes that, in Michigan, "[d]uress requires compulsion or coercion by which one is illegally forced to act by fear of serious injury to person, reputation or fortune." *Apfelblat v. National Bank Wyandotte–Taylor,* 158 Mich.App. 258, 263, 404 N.W.2d 725 (1987) (citing *Norton v. State Highway Dep't,* 315 Mich. 313, 319, 24 N.W.2d 132 (1946)). Nothing in the record suggests that plaintiff was coerced into executing the releases by illegal means.

the release would advance the public interest." *Id.* at 380; *see also Lynch v. City of Alhambra,* 880 F.2d 1122, 1126 n. 6 (9th Cir.1989) (arguing that there is only one inquiry); *but compare Woods v. Rhodes,* 994 F.2d 494, 500–01 (8th Cir. 1993) (apparently treating the analyses as distinct).

*Livingstone,* 91 F.3d at 527 (emphasis added).

In contrast, the Sixth Circuit has expressly adopted a three part analysis:

> In sum then, the *Rumery* opinion instructs us that before a court properly may conclude that a particular release-dismissal agreement is enforceable, it must *specifically determine* that (1) the agreement was voluntary; (2) there was no evidence of prosecutorial misconduct; and (3) enforcement of the agreement will not adversely affect relevant public interests. The burden of proving *each* of these points falls upon the party in the § 1983 action who seeks to invoke the agreement as a defense.

*Coughlen,* 5 F.3d at 974 (emphasis added). The distinction between an analysis of prosecutorial misconduct and possible adverse effects on relevant public interests was recognized by the Sixth Circuit by illustration:

> While a district court conducting a *Rumery* analysis should not prejudge the civil plaintiff's § 1983 claim, the existence of substantial evidence of police misconduct in a particular case is by no means irrelevant to a proper *Rumery* inquiry, since it could be probative of the motives of the prosecutor for seeking such an agreement, *as well as* the degree to which enforcing the agreement would serve the public interest.

*Id.,* at 974 (emphasis added). Still further:

> *Rumery also requires* a court reviewing a release-dismissal agreement to weigh or balance the interests on both sides of the issue of enforceability.

*Rumery,* 480 U.S. at 392, 107 S.Ct. at 1191; *id.* at 399, 107 S.Ct. at 1195 (O'Connor, J., concurring in part and in the judgment). Therefore, in a case where there existed substantial evidence of police misconduct, a court reviewing the release-dismissal agreement could conclude that the public's interest in vindicating constitutional rights and deterring police misconduct by permitting a specific civil complaint to go forward, *despite a release,* outweighs a general prosecutorial interest in helping to manage a heavy case load.

*Id.,* at 975 (emphasis added).

In *Friebis v. Kifer,* Nos. 00–4351, 00–4432, 2002 WL 2026437 (6th Cir. Aug. 29, 2002), the Sixth Circuit affirmed a district court's decision not to enforce an otherwise voluntary release agreement in the face of evidence of police misconduct. The district court denied a pre-trial motion for summary judgment based on the release, as well as a renewed post-verdict motion for dismissal based on the release. In applying a three part analysis, the 2–1 majority reasoned:

> Although the evidence of police misconduct in the instant case did not rise to the level presented to this court in *Coughlen,* a jury nonetheless concluded that Officer Kifer violated the constitutional rights of Becky Friebis. Accordingly, it would be inconsistent with *Rumery* and *Coughlen* if we did not take that conclusion into consideration when determining whether the public interest is served by enforcement of the release-dismissal agreement. Given the jury's verdict [that Officer Kifer had used excessive force when arresting Becky Friebis], we affirm the district court's decision not to enforce the release-dismissal agreement.

*Friebis,* at 703–04. Clearly, the Sixth Circuit weighed all of the evidence placed

before the jury, as opposed to just the evidence available to the prosecutor at the time the release was executed, in deciding that the district court properly decided not to enforce the release.

Applying Sixth Circuit precedent, proof of the absence of prosecutorial misconduct alone does not mandate a finding that a voluntary release should be enforced; this court must also consider whether enforcement of the release will adversely affect the public interest in vindicating constitutional rights and deterring police misconduct. Plaintiff's claim that she was sexually assaulted by Officer Smith on May 3, 1998 is not frivolous. Evidence of the sexual assault is probative of the degree to which enforcing the release would serve the public interest, independent of an analysis of prosecutorial misconduct. *Coughlen*, 5 F.3d at 974. Defendants bear the burden of each of the three *Rumery* factors: voluntariness, an absence of prosecutorial misconduct, and that enforcement of the release will not adversely affect relevant public interests. *Id.*

Without knowledge of the alleged May 3, 1998 assault, the Prosecutor could not have weighed the public interests of vindicating constitutional rights and deterring police misconduct against the prosecutorial interests involved in accepting plaintiff's careless driving plea in lieu of an OWI trial. In the *Livingstone* case relied on by the defendants, the Third Circuit remanded for a determination of whether the prosecutor had in fact made an individualized determination of whether the civil rights claims were marginal or frivolous, and whether the prosecutor knew of the evidence supporting the claims of alleged police misconduct. *Livingstone*, 91 F.3d at 531–532.

The record does not indicate that [prosecutor] Heneks considered whether the Livingstones' civil rights claims were marginal or frivolous before concluding the agreement. In *Cain*, we stated that *a prosecutor must conduct an "individualized analysis" of a defendant's civil rights claims before concluding a release-dismissal agreement,* 7 F.3d at 383, and that *in order for a release-dismissal agreement to be enforceable "there must be a case-specific showing that the released civil rights claims appeared to be marginal or frivolous at the time the agreement was made* and that the prosecutor was in fact motivated by this reason." *Id.* [16].

---

[16]. *Cain* implied that prosecutors might be excused from its requirement that they determine whether released civil rights claims appear marginal or frivolous in cases in which other public-interest reasons support enforcement of a release-dismissal agreement. See *id.* (referring to a showing that "the release-dismissal agreement advanced any other public interest"). This exception must necessarily be reserved for cases, like *Rumery*, in which unusually strong public interests support the release-dismissal agreement. *See infra* note 27. If prosecutors could routinely avoid assessing the merits of civil rights claims merely by citing such considerations as the avoided costs of trial—considerations that, as we have already noted, could be cited in virtually any case—*Cain* would have little force . . . . .

*Id.,* at 529 n. 16.

Prosecutor Dale Schneider attests in a September 20, 2001 affidavit that he accepted plaintiff's plea to careless driving after considering that plaintiff had no prior record, had registered only a .07 blood-alcohol content at the police station, and because he wasn't aware of any allegations of impropriety involving Officer Smith. Defendants' February 18, 2003 Exhibit C, ¶¶ 4–5, at 2. Construing this evidence in a light most favorable to plaintiff, it may reasonably be inferred that the Prosecutor never asked plaintiff whether she had any reason not to release all claims she may have against "THE CITY, ITS OFFICERS, EMPLOYEES, AND AGENTS."

While the court does not equate this failure to query plaintiff as "prosecutorial misconduct", as it might be characterized by the Third Circuit for failure to make an "individualized analysis" before accepting a release, the proffered affidavit supports plaintiff's argument that the release contained in the 45–A District Court form constituted a "blanket release" that was routinely executed by the Prosecutor [3], and is now supported by public interest reasons that could be relied upon in every criminal case—that the prosecutor believed the criminal defendant was deserving of leniency, which weighed against proceeding to trial on a greater charge. In light of the evidence supporting plaintiff's sexual assault claim, the court concludes that the defendants have not met their burden of proving that enforcement of the subject release would not adversely affect the relevant public interests in vindicating constitutional rights and deterring police misconduct. *Coughlen*, 5 F.3d at 974; *Burke*, 167 F.3d at 281. Defendant's argument that Officer Smith's criminal conviction vindicated plaintiff's constitutional rights is not well taken, as the criminal matter adjudicated only alleged violations of a state criminal statute. A finding of civil liability further deters police misconduct, particularly if the judgment extends to the municipality. Permitting plaintiff's civil complaint to go forward, despite the release, outweighs the generalized prosecutorial interest advanced here for securing plaintiff's plea to careless driving. *Coughlen*, 5 F.3d at 975. As required, the court specifically determines that, although there is no evidence of prosecutorial misconduct, enforcement of the release would adversely affect relevant public interests. *Id.*, at 974; *Winningham*, 42 F.3d at 984.

### B. ELCRA Claims

Plaintiff's Counsel represented to the court at the March 6, 2003 hearing that plaintiff concedes to the dismissal of her ELCRA claims. Defendants are entitled to dismissal of plaintiff's ELCRA claims as a matter of law. *Winningham*, 42 F.3d at 984; *Kraft*, 991 F.2d at 296.

### C. Chief Henderlight's Individual § 1983 Liability

To support a verdict finding Chief Henderlight individually or personally liable under 42 U.S.C. § 1983, plaintiff must prove that Chief Henderlight encouraged, or in some other way participated in, Officer Smith's May 3, 1998 alleged sexual assault of plaintiff. *See Taylor v. Mich. Dept. of Corrections*, 69 F.3d 76, 81 (6th Cir.1995) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984)). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* Even as to the allegations that Chief Henderlight's failure to train and supervise resulted in the alleged sexual assault, plaintiff must be able to prove that Chief Henderlight abandoned his supervisory responsibilities in the face of "actual knowledge" of ongoing constitutional violations. *Id.* (citing *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)).

Plaintiff does not allege, nor proffer evidence, that Chief Henderlight participated in, encouraged, implicitly authorized, or knowingly acquiesced in Officer Smith's May 3, 1998 alleged sexual assault of plaintiff. Neither has plaintiff proffered evidence that Chief Henderlight abandoned his supervisory responsibilities with "actu-

---

**3.** The better practice would have been to ask plaintiff on the record whether she believed she had any claims against the City of Berk- ley, or its Officers, Employees, and Agents, before plaintiff executed the release.

al knowledge" that Berkley Police Officers posed a risk on or before May 3, 1998 of sexually assaulting females upon arrest. It is undisputed that two other incidents of alleged sexual assaults committed by Officer Smith first came to light after May 3, 1998, the first in July 1998 (Corrine Pokryfke)[4], and the second on December 23, 2000 (Jane Doe). Construing the pleadings and evidence in a light most favorable to plaintiff, Chief Henderlight cannot be found individually liable to plaintiff for the alleged May 3, 1998 sexual assaults as a matter of law. *Taylor*, 69 F.3d at 81; *Winningham*, 42 F.3d at 984.

Qualified immunity is only germane to the issue of whether Chief Henderlight, or Officer Smith, may be held individually liable, in that "a municipality is not entitled to qualified immunity." *Barber v. City of Salem, Ohio*, 953 F.2d 232, 237 (6th Cir.1992) (citing *Owen v. City of Independence*, 445 U.S. 622, 627, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). An action against a city official in his official capacity is treated as an action against the city itself. *Id.* Chief Henderlight cannot be held individually liable on this record. *Taylor*, 69 F.3d at 81. Officer Smith does not argue that the alleged sexual assault, if proven, is subject to the defense of qualified immunity.

### D. § 1983 Municipal/Official Capacity Liability

■ To hold City of Berkley or Chief Henderlight, in his official capacity, liable under 42 U.S.C. § 1983, plaintiff must prove that Officer Smith's May 3, 1996 alleged sexual assaults were the product of an unconstitutional policy, custom, or practice of "deliberate indifference" towards plaintiff's constitutional rights. *Oklahoma v. Brown*, 520 U.S. 397, 403–404, 117 S.Ct.

1382, 137 L.Ed.2d 626 (1997) (citing *Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) and *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). This deliberate indifference must be the "moving force" behind the constitutional violation, that is, the plaintiff must show "that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*, at 404, 117 S.Ct. 1382.

Berkley Public Safety Department "General Public Order No. 15" ("GPO 15"), dated December 13, 1989, reads in pertinent part:

*PURPOSE:*

To create a uniform policy to be used by all members of the department when receiving, processing and lodging prisoners in the lock-up facility.

I. *RECEIVING OF PRISONERS*

A. All prisoners will be received via the sally port.

B. All firearms shall be deposited in the gun locker provided in the sally port area.

C. Once access has been gained, the overhead door shall be closed before prisoners are allowed outside the vehicle.

D. Restraints (handcuffs, etc.) will not be removed in the sally port area.

E. No weapons shall be taken into the lock-up area except at the direction of a command officer.

II. *SEARCH OF PRISONERS*

A. A *complete search* of all prisoners will be conducted by the arresting or booking ·officer and the cell interior in-

---

**4.** Smith was convicted of three counts of criminal sexual conduct relative to Corrine

Pokryfke in September 2001.

spected for unauthorized items prior to placing prisoners in the cell.

B. If possible, prisoners being booked should be searched by a member of the same sex or a member of the same sex should be present when the search is conducted.

C. Strip searches shall not be conducted without authorization from the Public Safety Director or his designee.

D. Body cavity searches shall not be conducted without a valid search warrant.....

\* \* \* \* \* \*

VII. *CONDUCT OF OFFICERS IN LOCK–UP*

A. All officers entering the lock-up will talk to the prisoners in an official, businesslike manner about official business only.

1. Police personnel will not joke with, argue with, verbally abuse or unnecessarily talk to a prisoner.

2. Police personnel will not give advice about or discuss the prisoner's case, except at the request of the officer in charge of the case.

3. No discussion will be held concerning any incidents in the lock-up or the fairness of any rules, regulations or laws.....

Plaintiff's February 5, 2003 Exhibit H (emphasis added). Plaintiff argues that GPO 15 is unconstitutional on its face because it authorizes "strip searches" of traffic offenders such as plaintiff, contrary to the holding in *Masters v. Crouch,* 872 F.2d 1248 (6th Cir.1989). Plaintiff also asserts that GPO 15's authorization of the possibility that a male police officer could "completely search" a female arrestee created a high risk of sexual assault in violation of the Fourteenth Amendment right to personal security and bodily integrity, as recognized in *Doe v. Claiborne County,* 103 F.3d 495, 507 (6th Cir.1996), particularly in the absence of any training, supervision or

guidance as to what constitutes a "complete search."

▮ Consistent with the Fourth Amendment right to be free from unreasonable searches and seizures, "a person charged only with a traffic violation or nonviolent minor offense may not be subjected to a strip search unless there are reasonable grounds for believing that the particular person might be carrying or concealing weapons or other contraband." *Masters,* 872 F.2d at 1257. Berkley Police Officers are prohibited by GPO 15, ¶ II, C, from conducting a strip search of any prisoner, arrested for any type of misdemeanor or felony offense, unless they receive authorization from the Berkley Public Safety Director or his designee. Berkley Police Officers are prohibited by GPO 15, ¶ II, D, from conducting body cavity searches of any prisoner unless an Officer has a valid search warrant. Plaintiff's argument that GPO 15 is unconstitutional on its face because it permits groundless strip searches of traffic offenders is without merit.

▮ Plaintiff's Fourteenth Amendment challenge is premised on a lack of training, supervision, or guidance as to what constitutes a "complete search" as the term is used in GPO 15, ¶ II, A. Reading GPO 15 as a whole, a "complete search" under GPO 15, ¶ II, A, does not include strip searches conducted without the approval of the Berkley Public Safety Officer, or body cavity searches performed without a valid warrant, searches that are prohibited by GPO 15, ¶¶ II, C and D. Use of the term "complete search" does not render GPO 15 facially unconstitutional.

Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a

municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably. We recognized these difficulties in *Canton v. Harris*, where we considered a claim that inadequate training of shift supervisors at a city jail led to a deprivation of a detainee's constitutional rights. We held that, quite apart from the state of mind required to establish the underlying constitutional violation—in that case, a violation of due process, 489 U.S. at 388–389 n. 8, 109 S.Ct. at 1205 n. 8—a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. *Id.*, at 388, 109 S.Ct. at 1204. A showing of simple or even heightened negligence will not suffice.

We concluded in *Canton* that an "inadequate training" claim could be the basis for § 1983 liability in "limited circumstances." *Id.*, at 387, 109 S.Ct. at 1204. We spoke, however, of a deficient training "program," necessarily intended to apply over time to multiple employees. *Id.*, at 390, 109 S.Ct. at 1205. Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability. *Id.*, at 390, n. 10, 109 S.Ct. at 1205 n. 10 ("It could ... be that the police, in exercising their dis-

cretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need"); *id.*, at 397, 109 S.Ct. at 1209 (O'CONNOR, J., concurring in part and dissenting in part) ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations ..."). In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a onetime negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury. *See id.*, at 390–391, 109 S.Ct. at 1205–1206.

*Brown*, 520 U.S. at 406–408, 117 S.Ct. 1382. A finding of municipal liability under 42 U.S.C. § 1983 cannot depend upon a mere probability that any officer will inflict any constitutional injury. *Id.*, at 412, 117 S.Ct. 1382. Rather, municipal liability "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.*, at 412, 117 S.Ct. 1382 (emphasis in original).

Construing the pleadings and evidence in a light most favorable to plaintiff, plaintiff has failed to come forward with evidence that a lack of training, supervision, or guidance by City of Berkley, and/or Chief Henderlight, acting in his official capacity, constituted "deliberate indifference" toward a risk that Officer Smith was highly likely to commit a sexual assault upon a female prisoner during a "complete search" conducted pursuant to GPO 15, ¶ II, A. It is undisputed that neither City of Berkley nor Chief Henderlight had notice prior to plaintiff's alleged sexual as-

sault on May 3, 1998 that Officer Smith, or for that matter any Berkley Officer, was sexually assaulting female prisoners. Plaintiff cannot prove that City of Berkley's or Chief Henderlight's reliance on the "complete search" language of GPO 15, ¶ II, A, represented "deliberate indifference" to a plainly obvious high risk that was known or should have been known by City of Berkley or Chief Henderlight that Berkley Police Officers were violating citizens' Fourteenth Amendment rights to personal security and bodily integrity.

The situation here is similar to that presented in *Martin v. Swift,* 781 F.Supp. 1250 (E.D.Mich.1992). The *Martin* plaintiff alleged that Royal Oak Police Officer Smith touched her breast inside her jacket, rubbed his hands on the inside of her thighs, and touched her genital area, during a pat-down search incident to her arrest for possession of marijuana. *Id.,* at 1251. The *Martin* plaintiff challenged as unconstitutional a Royal Oak policy permitting male police officers to search female arrestees. *Id.,* at 1254. The district court applied *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), cited for the holding that a single act of misconduct by a street officer is an insufficient basis upon which to impose municipal liability, and concluded there was "no question" that the search policy at issue was constitutional because "[t]o find otherwise would require every police car to carry two officers, one male and one female, so that misdemeanants would be searched by the same sex." *Id.* The district court continued that the municipality City of Royal Oak and Police Chief Kemp could not be held liable for a single alleged incident of unconstitutional activity absent "any history of abuse during pat-down searches by Royal Oak police officers or a history of abuse by defendant Swift." *Id.,* 1254. In the case at bar, plaintiff Oliver has likewise failed to allege or come forward with evidence indicating a pre-May 3, 1998 history of abuse by Berkley Police Officers or Officer Smith of their authority to conduct "complete searches" under GOP 15.

Instead, plaintiff proffers evidence that several Officers, including Officer Smith, were not trained regarding any specific limitations regarding a "complete search." This court agrees with the reasoning in *Williams v. Board of County Commissioners of Wyandotte County/Kansas City,* No. 98–2485–JTM, 2000 WL 1375267 (D.Kan. Aug. 30, 2000):

> .... As noted earlier, the court must apply "rigorous standards of culpability and causation" to justify liability on the defendant municipal entities. Courts presented with similar complaints of sexual assault have uniformly found that training or its absence does not cause the plaintiff's injuries. Thus, in *Barney v. Pulsipher,* 143 F.3d [1299, 1308 (10th Cir.1998)], in which female jail inmates brought a § 1983 action alleging rape by jailers, the Tenth Circuit first concluded that there was no evidence the county knew of a pattern of violations and that there was no evidence the jail training programs were inadequate. The court also wrote that "we are not persuaded that a plainly obvious consequence of a deficient training program would be the sexual assault of inmates. Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior." Similarly, in *Andrews v. Fowler,* 98 F.3d 1069, 1077 (8th Cir.1996) (internal quotations omitted), the court wrote: "In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women. Moreover, even if the training was in some manner deficient, the identified deficiency in a city's training program

must be closely related to the ultimate injury such that the deficiency in training actually caused the police officers' offending conduct." *See also Floyd v. Waiters*, 133 F.3d 786, 796 (11th Cir. 1998); *Sewell v. Town of Lake Hamilton*, 117 F.3d 488 (11th Cir.1997). Here, the proper course of conduct—refraining from sexual assault and rape—is patent and obvious; structured training programs are not required to instill it. Consequently, the absence of such programs (even if such absence was proven) is not so likely to cause improper conduct so as to justify a finding of liability. *Id.*, at *6. Indeed, plaintiff's expert Lou Reiter opines that Officer Smith's alleged misconduct "would have been known to any reasonable officer to be extremely intrusive, objectively unreasonable and contrary to generally accepted police practices with no justification for the specifics of the encounter and detention of Mrs. Oliver for a traffic related offense." Plaintiff's February 5, 2003 Exhibit B, ¶ 13, at 7–8. Plaintiff's second expert opinion of Clinton L. Donaldson, Ed.D., that "the City of Berkley acted with deliberate indifference when they failed to train supervisors/officers ... [to] competently provide services to citizens (prisoners)" is conclusionary, and unsupported by evidence that City of Berkley's or Chief Henderlight's alleged "deliberate indifference" to training Officers not to commit sexual assaults under the guise of a "complete search" was the "moving force" behind Officer Smith's alleged May 3, 1998 sexual assault. *Brown*, 520 U.S. at 404, 117 S.Ct. 1382.

Plaintiff also proffers evidence that Chief Henderlight's alleged lack of supervision and "see nothing" attitude resulted in what could be termed a sexually hostile work environment, leading to the posting of pictures of naked women at the Police Station, the viewing of pornographic materials on website locations and film, and an act of masturbation by a Police Officer (not Officer Smith) in front of a dispatcher, as well as a general lack of diligence in pursuing citizen complaints about possible Police misconduct. None of this evidence raises a reasonable inference that City of Berkley or Chief Henderson were deliberately indifferent to a risk that Officer Smith was highly likely to inflict a sexual assault upon a female prisoner. *Brown*, 520 U.S. at 412, 117 S.Ct. 1382. Defendants City of Berkley and Chief Henderlight, in his official capacity, are entitled to summary judgment of plaintiff's 42 U.S.C. § 1983 claims [5] as a matter of law. *Winningham*, 42 F.3d at 984.

### E. Intentional Infliction of Emotional Distress

This court has previously held, consistent with other federal district courts and the Michigan Court of Appeals, that the tort of intentional infliction of emotional distress is actionable in Michigan. *See Willis v. New World Van Lines, Inc.*, 123 F.Supp.2d 380 (E.D.Mich.2000); *Howard v. Calhoun County*, 148 F.Supp.2d 883, 892 n. 4 (W.D.Mich.2001) ("Although the tort of intentional infliction of emotional distress has yet to be formally recognized by the Michigan Supreme Court, it has often been recognized by the Michigan Court of Appeals."). Intentional infliction of emotional distress requires proof of: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Graham v. Ford*, 237 Mich.App. 670, 674, 604 N.W.2d 713 (1999). Liability attaches only where the conduct is so outrageous in

---

5. Defendants are likewise entitled to summary judgment of plaintiff's undeveloped Fifth and Eighth Amendment claims absent proof that an official policy, custom or practice was the moving force behind the May 3, 1998 sexual assault.

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.*

▇▇▇▇▇ Plaintiff's instant intentional infliction of emotional distress claim is alleged only against defendant Officer Smith. *See* August 13, 2001, Count II (reading "INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Defendant SMITH only)"). Construing the pleadings and evidence in a light most favorable to plaintiff, a reasonable jury could conclude that Officer Smith's alleged sexual assault constituted outrageous conduct actionable under a claim of intentional infliction of emotional distress. Plaintiff has not, however, come forward with evidence that City of Berkley or Chief Henderlight committed acts of extreme and outrageous conduct that were a proximate cause of Officer's Smith's alleged sexual assaults. Further, as a consequence of pleading the claim of intentional infliction of emotional distress as against Officer Smith only, plaintiff has failed to plead the state tort claim in avoidance of governmental immunity with respect to City of Berkley as a municipality, and Chief Henderlight as an officer of City of Berkley. *See Mack v. City of Detroit*, 467 Mich. 186, 193–196, 199, 649 N.W.2d 47 (2002) (citing M.C.L. § 691.1407[6](1) and holding that plaintiff must plead a cause of action in avoidance of governmental immunity). Accordingly, defendants City of Berkley and Chief Henderlight are entitled to summary judgment of plaintiff's intentional infliction of emotional distress claims to the extent they are now raised by plaintiff. *Winningham*, 42 F.3d at 984; *Mack*, 467 Mich. at 193–196, 199, 649 N.W.2d 47; *Graham*, 237 Mich.App. at 674, 604 N.W.2d 713.

## IV. Conclusion

Defendants City of Berkley's and Bruce Henderlight's motion for summary judgment, and defendant Brent Smith's joinder in the motion, is hereby DENIED, IN PART, to the extent the motion is based on release. The remainder of City of Berkley's and Henderlight's motion for summary judgment is hereby GRANTED as to plaintiff Kristin Oliver's claims of liability under 42 U.S.C. § 1983, Michigan's ELCRA, and plaintiff's recent argument of liability for intentional infliction of emotional distress. Plaintiff's claims as alleged against City of Berkley and Henderlight ONLY are hereby dismissed with

---

**6.** "(1) Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:

(a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L. § 691.1407(1), (2).

prejudice in their entirety. Plaintiff's claims of assault and battery, intentional infliction of emotional distress, and 42 U.S.C. § 1983 liability, as alleged against defendant Smith ONLY, remain viable.

SO ORDERED.